UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA,

  -v-                                                                                           No.  16CR33-LTS

KAIN MELENDEZ,

                Defendant.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        Defendant Kain Melendez ("Melendez" or "Defendant") is charged in the above-captioned indictment with one count of violating 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by individuals who have previously been convicted of felonies, and one count of violating 21 U.S.C. §§ 812 and 841(a)(1) and (b)(1)(C), which prohibit the possession and distribution of controlled substances.  Defendant has moved to suppress evidence found during a search conducted pursuant to a warrant executed on November 30, 2015, as well as statements made to police officers following his arrest.[1]  The Court has carefully considered the parties' submissions, as well as the oral argument held on July 14, 2016, and, for the reasons stated below, denies Defendant's motion in its entirety.

---

[1] At a conference before the Court on March 3, 2016, the Government indicated that, while Melendez did in fact make post-arrest statements following a request for counsel, the Government does not intend to rely on those statements in its case in chief.  (See Docket Entry No. 10 at 2:25-3:5.)  The Government confirmed this position at a subsequent conference on May 13, 2016, at which the parties agreed that the Court need not decide whether Melendez's post-arrest statements are subject to suppression.  (See Docket Entry No. 18 at 15:22-17:11.)  In light of this agreement, the Court will not address that question here.

BACKGROUND[2]

On November 29, 2015, F.B.I. Special Agent John Reynolds ("Reynolds") submitted a search warrant application to United States Magistrate Judge Frank Maas, seeking permission to conduct a search, pursuant to Federal Rule of Criminal Procedure 41(c), for evidence of a crime, contraband/fruits of a crime, and a person to be arrested. (See Docket Entry No. 17, Ex. 1 at ECF p. 1; Reynolds Warrant Aff. ¶ 5.) The warrant request stemmed from a homicide that had been committed five days earlier, on November 24, 2015, when an individual was shot and killed in broad daylight in the Bronx, New York. (See generally Pizzaro Compl.; see also Reynolds Warrant Aff. ¶ 8.) The alleged shooter, Ruben Pizzaro ("Pizzaro"), is, according to the Government, a gang member who allegedly committed the murder in furtherance of a gang-related narcotics trafficking scheme. (See generally Pizzaro Compl.) Special Agent Reynolds, along with several other members of the FBI, were at the time involved in an ongoing investigation of violent gang activity and drug dealing in parts of the Bronx, including the precinct in which the murder took place. (See Pizzaro Compl. ¶¶ 2-3.)

Agent Reynolds' warrant application indicated that, on November 29, 2015, the NYPD's Crimestoppers tipline had received a call from an anonymous individual regarding Pizzaro's whereabouts. (See Reynolds Warrant Aff. ¶ 10.) Both Crimestoppers personnel and an NYPD detective spoke with the caller, who explained that Pizzaro had been hiding out at an

---

[2]   The facts recited herein are drawn from the facts asserted in the Complaint (Docket Entry No. 1 ("Complaint")); the sworn statements in Special Agent John Reynolds' affidavit in support of the search warrant (Docket Entry No. 17, Ex. 1 at ECF pp. 2-10) ("Reynolds Warrant Aff.")); the sealed complaint against Ruben Pizzaro submitted by Agent Reynolds in support of the search warrant application (Docket Entry No. 17, Ex. 1 at ECF pp. 12- 17) ("Pizzaro Compl."); the Affirmation of Vincent M. Southerland in Support of the suppression motion (Docket Entry No. 15) ("Southerland Aff."); and the search warrant itself (Docket Entry No. 17, Ex. 1 at ECF pp. 17-19) ("Warrant")).

apartment on Crotona Parkway in the Bronx (the "Premises") for several days. (Reynolds Warrant Aff. ¶ 10(a).) Reynolds further affirmed that the caller had stated, in sum and substance, that: Pizzaro had been at the Premises with an individual named "Cain"; that the semiautomatic firearm used in the November 25, 2015, homicide was either a 9 millimeter or a .45 caliber semiautomatic weapon; that the firearm could be found at the Premises in a white cabinet in "Cain's" bedroom; that "Cain" was a light-skinned Hispanic male about 5'6" and 180 pounds with a bald head; and that Pizzaro left the Premises every morning by 5:00 a.m. in order to evade arrest.[3] (Id. ¶10(b)-(e).)

        Reynolds thereafter corroborated elements of the information supplied by the

---

[3]  At the oral argument held on July 14, 2016, defense counsel pressed the argument that this information, which Reynolds appears to attribute to a single anonymous caller, actually represents information supplied by three different anonymous callers, pointing to certain overlaps in details among records of three anonymous calls to Crimestoppers and another tip line. (see Transcript of July 14, 2016, Oral Argument ("Trans.") at 6:19-10:22, 12:12-13:15, 15:3-16:4, 30:22-32:24; see also Reply Memorandum of Law (Docket Entry No. 24 ("Reply Memo"), Exs. D, E, F.) In a surreply affidavit, Agent Reynolds proffered that NYPD detectives, not written call records, were the source of the details proffered in his warrant affidavit regarding the information supplied by the Crimestoppers caller. (See Docket Entry No. 28, Surreply Memorandum of Law ("Surreply"), Ex. A.) According to records produced by the Government, all three anonymous calls were received on the morning of November 29, 2015. According to a typewritten record, the first caller said he or she had seen a "wanted" photo of Pizzaro on Bronx News 12, and said that Pizzaro had been seen the previous few nights in front of 611 Crotona Park North (a location approximately a mile away from the 2116 Crotona Parkway apartment) and an adjacent building. (Reply Memo , Ex. E.) The caller stated that Pizzaro "is always seen hanging out in the vicinity of these locations drinking with his friends around the hours of 9:00 p.m. through the night." (Id.) The second anonymous call was made to an "Operation Gunstop" line and is reflected in a handwritten record that refers to defendant Melendez rather than Pizzaro, indicating that Melendez had a 9 millimeter semiautomatic gun at the Crotona Parkway apartment. (Reply Memo, Ex. F.) The third typewritten call record describes Pizzaro as staying with Kain at the Crotona Parkway apartment, describes Kain, and states that the gun used in the homicide is located in a white cabinet in Kain's bedroom. (Reply Memo, Ex. D.)

anonymous caller.  First, he researched NYPD reports regarding the November 25, 2015, homicide, as well as ballistics evidence recovered in connection therewith, and determined that the murder weapon was, in fact, a 9 millimeter gun.  (Reynolds Warrant Aff. ¶ 11(a).)  Reynolds also searched Department of Motor Vehicle Records, from which he was able to discern that an individual named "Cain" Melendez had listed the Premises as his place of residence, and that Melendez's driver's license listed his height as 5'7".  (Id. ¶ 11(b).)  Reynolds also examined a prior arrest photograph, as well as a photograph on what he believed to be Melendez's Facebook page, which revealed Melendez to be a light skinned Hispanic male with a bald head.  (Id. ¶ 11(c).)  Finally, Reynolds looked into Melendez's criminal history reports where he found that, following a prior arrest, Melendez had indicated that he lived at the Premises.  (Id. ¶ 11(d).)  The report also indicated that Melendez was listed at 5'7" and 185 pounds, further corroborating the anonymous tipster's description.  (Id.)  Reynolds related each of the foregoing steps in his affidavit in support of the warrant.  (See id. ¶ 11.)

In light of his corroboration of information supplied by the tipster, Reynolds asserted that probable cause existed to believe that evidence pertaining to the November 25, 2015, murder – and perhaps even Pizzaro himself – might be found at the Premises.  (Id. ¶ 12.)  Because the tipster had stated that the murder weapon was being stored in a white cabinet, Reynolds requested authorization to search locked cabinets, safes and other containers found at the Premises.  (Id. ¶ 14.)  Furthermore, in light of the tipster's suggestion that Pizzaro left the Premises at 5:00 a.m. each morning to avoid detection, Reynolds asked the Court to authorize execution of the search warrant at any time, day or night.  (Id. ¶ 12.)  On the basis of Reynolds' affidavit, as well as the criminal complaint against Pizzaro (which Reynolds attached to his application), Judge Maas signed the search warrant on November 29, 2015, at 5:25 p.m.  (See

Warrant.)  The Warrant authorized a search of the Premises, including "all locked and closed containers contained therein," for: firearms, ammunition and other weapons; a dark hooded sweatshirt, a light-colored jacket with a hood, jeans, and/or yellow/tan boots; indicia of occupancy, residency, rental and/or ownership of the premises; and cellular telephones.  (See Warrant)  The Warrant was authorized to be executed at any time, day or night, on or before December 8, 2015.  (Id.)

The Warrant was executed on November 30, 2015, at 3:20 a.m., approximately 10 hours after it was issued.  (Compl. ¶ 3(c); Southerland Aff ¶ 4.)  During their search of the Premises, detectives observed Melendez's passport, mail and documents addressed to Melendez in one of the bedrooms.  (Compl. ¶ 3(d); Southerland Aff. ¶ 5.)  Detectives also found 30 glassines of heroin and a box containing a black 9 millimeter Armscor Rock Island Armory firearm, a magazine containing nine 9 millimeter cartridges, and an additional twenty-one 9 millimeter cartridges.  (Compl. ¶ 3(e)-(f); Southerland Aff. ¶ 5.)  Neither Melendez nor Pizzaro was present at the Premises at the time of the search.  (Southerland Aff. ¶¶ 5-6.)  At approximately 6:00 a.m. that same day, Melendez was arrested.  (Id. ¶ 6.)

### DISCUSSION

Legal Standards

*The Probable Cause Standard and Anonymous Tipsters*

The Fourth Amendment to the United States Constitution provides that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized." U.S. CONST. AMEND. IV.  The Supreme Court has held that "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." Kentucky v. King, 131 S. Ct. 1849, 1856 (2011). In considering a request for a search warrant, the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Howe, 545 F. App'x 64, 66 (2d Cir. 2013).  The "totality of the circumstances must present the [issuing] magistrate with sufficient information to allow that official to make the necessary [probable cause] determinations; his action cannot be a mere ratification of the bare conclusions of others." United States v. Clark, 638 F.3d 89, 97 (2d Cir. 2011) (internal quotation marks and citation omitted).  However, the Fourth Amendment does not require "the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands." Gerstein v. Pugh, 420 U.S. 103, 121 (1976).  Rather, a demonstration of the probability, rather than a prima facie showing, of criminal activity is sufficient to satisfy the probable cause standard.  See Gates, 462 U.S. at 239.  Moreover, the training of law enforcement agents bears significantly on a probable cause determination, and inferences drawn by law enforcement agents based on facts known to them may lend significant support to a probable cause finding.  Gates, 462 U.S. at 232.

        The Second Circuit has recognized that, when an affidavit submitted in support of a search warrant is based on information supplied by an anonymous tipster, the totality of the circumstances must be examined carefully in order to assess the validity of that information.  See United States v. Gagnon, 373 F.3d 230, 235-37 (2d Cir. 2004).  Such warrants demand close judicial scrutiny, and an inquiry into the anonymous tipster's reliability, veracity and basis of

knowledge are at the core of such scrutiny.  See United States v. Wagner, 989 F.2d 69, 72-73 (2d Cir. 1993); see also United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) ("an informant's basis of knowledge and veracity remain important factors in a 'totality of the circumstances' analysis.").  Close consideration of anonymous tips is essential, as "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." Alabama v. White, 496 U.S. 325, 329 (1990).  Thus, in conducting an examination of the totality of the circumstances surrounding information supplied by an anonymous tipster, a court should consider "the extent to which an informant's statements – even about a suspect's innocent activities – are independently corroborated."  Gagnon, 373 F.3d at 235; see also Lopez v. Greiner, 323 F. Supp. 2d 456, 473 (S.D.N.Y. 2004) (a warrant application must set forth facts sufficient to establish "first, the veracity of the informant's tip – that is, some reason to credit it – and second, the basis of his or her knowledge.").  While a "tip from a completely anonymous informant . . . can form the basis of reasonable suspicion or probable cause if it is sufficiently corroborated . . . [w]here the informant is completely anonymous . . . a significant amount of corroboration will be required." United States v. Elmore, 482 F.3d 172, 180-81 (2d Cir. 2007).

      The basis of an anonymous informant's knowledge can be verified sufficiently if "the informant personally observed or participated in the criminal activity at issue" or by a corroborative investigation by the police that confirms "sufficient details suggestive of or directly related to criminal activity." Lopez, 232 F. Supp. 2d at 474.  Corroboration solely of innocent, readily observable details that do not tend to establish the likelihood of criminality has consistently been found insufficient to establish probable cause.  See Florida v. J.L., 529 U.S. 266, 270-272 (2000).  Nevertheless, the corroboration of such "innocent details" may well indicate "a higher probability that the incriminating facts [supplied by the anonymous tipster] are

true." See Canfield, 212 F.3d at 720; see also Gagnon, 373 F.3d at 236 (finding that "even if only an informant's account of anticipated innocent activities is confirmed," such confirmation carries some weight in a totality of the circumstances analysis as "an informant who is right about some facts is more likely to be right about others.").

Once a warrant has issued, a court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998), and must accord "considerable deference to the probable cause determination of the issuing magistrate." Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007). The Second Circuit has noted that, under this deferential standard, an individual "who argues that a warrant was issued on less than probable cause faces a heavy burden." Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review . . . so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Gates, 462 U.S. at 236 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

*The Good Faith Exception to the Exclusionary Rule*

Even when a reviewing court concludes that probable cause was lacking to support the issuance of the warrant, the evidence revealed by the search may be admitted under certain circumstances. The Supreme Court has recognized that the exclusionary rule does not apply where evidence has been "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984). Indeed, "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." United States v. Clark, 638 F.3d 89, 100 (2d Cir.

2011) (internal quotation marks and citations omitted); see also Leon, 468 U.S. at 922 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."). The burden rests with the Government to demonstrate the objective reasonableness of an officer's good faith reliance on an invalidated warrant. See Clark, 638 F.3d at 100. When evaluating whether an officer has reasonably relied on a warrant in good faith, "[t]he question . . . is not whether the magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued . . . [but] whether the magistrate so obviously erred that any reasonable officer would have recognized the error." Messerschmidt v. Millender, 132 S. Ct. 1235, 1250 (2012). "Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officer[ ] to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." Martel v. Town of South Windsor, 345 F. App'x 663, 664 (2d Cir. 2009) (summary order). The Supreme Court has identified four circumstances where the good faith exception to the exclusionary rule would not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992) (citing Leon, 468 U.S. at 923). Melendez appears to invoke the first and third of these circumstances in his opposition to application of the good faith exception; he does not argue that Judge Maas abandoned his judicial role or that the warrant itself was facially deficient.

Validity of the Search Warrant

        Melendez offers two main arguments in support of suppression. First, he argues that Special Agent Reynolds' corroboration of the caliber of the gun used in the November 25, 2015, homicide and the "innocent information" supplied by the anonymous caller were insufficient to support a probabilistic finding that a search of the Premises would reveal the instrumentalities of a crime and/or Pizzaro himself. Melendez also argues that, whether or not the application was sufficient to establish probable cause for issuance of the warrant, the good faith exception to the exclusionary rule is inapplicable here because Reynolds made material misrepresentations in, and omissions from, his Search Warrant Affidavit and therefore cannot be found to have reasonably relied on the warrant in good faith.

        Melendez argues that Reynolds' investigation of the reliability of the tip was deficient because the bulk of the information Reynolds corroborated was "innocent," readily ascertainable information that did not tend to establish the likelihood of criminality. Melendez notes specifically that the tipster supplied the Crimestoppers hotline with predictive information about Pizzaro's future behavior – namely, his tendency to leave the Premises each morning by 5:00 a.m. in order to avoid law enforcement detection – provided Reynolds with a concrete opportunity "to test the informant's knowledge or credibility," of which Reynolds failed to take advantage. J.L., 529 U.S. at 271. Without having corroborated this information, Melendez asserts, all that remained as a basis for Reynolds' affidavit in support of the warrant was "the bare report of an unknown, unaccountable informant who neither explained how he knew" what he knew "nor supplied any basis for believing that he had inside information," about Melendez and his alleged criminal activities. Id. Such a report, Melendez argues, fell far short of establishing probable cause for issuance of the search warrant.

The Court need not determine whether probable cause existed for issuance of the warrant, as the good faith exception to the exclusionary rule is plainly applicable. The Court finds that the totality of the circumstances, particularly in light of Agent Reynolds' corroboration of the caliber of firearm used in the November 25, 2015, homicide, provided a sufficient basis for Agent Reynolds to have reasonably relied on Judge Maas' probable cause determination. Reynolds was able to corroborate a specific detail about the criminal activity at issue – the type of gun used in the November 25, 2015, shooting – which was a "sufficient detail[] suggestive of or directly related to criminal activity." Lopez, 232 F. Supp. 2d at 474. This particular piece of information is more significant than the otherwise "innocent" information confirmed by Reynolds, and was a significant indicator of the veracity of the informant's tip.[4] Whether or not this particular piece of information was sufficient to establish probable cause for a search of the Premises, the Court holds that – based on his corroboration of this key detail – Agent Reynolds' reliance on the search warrant was objectively reasonable. See Leon, 468 U.S. at 922.

Melendez further argues that discrepancies between the tip line records memorializing the call from the tipster upon whose information Agent Reynolds represents he relied and Reynolds' recitation of facts in his warrant affidavit are indicative of falsehoods or omissions undermining the availability of the good faith exception. (Reply Memo at pp. 8-11.)

---

[4] Additionally, corroboration of the "innocent" facts supplied by the anonymous tipster increased the odds that the tipster was likely to be correct with respect to the key detail of criminal activity – namely, the type of gun used in the November 25, 2015, homicide – that he or she supplied. See Canfield, 212 F.3d at 720; see also Gagnon, 373 F.3d at 236. Despite the fact that the tipster provided no information (other than knowledge that the gun used was a 9 millimeter or a .45 caliber weapon) indicating that he or she personally observed or participated in the criminal activity at issue, Reynolds' corroboration of the innocent details (including Melendez's physical appearance and connection to the Premises) enhanced the tipster's overall credibility and elevated the veracity of the tip as a whole.

Melendez emphasizes the fact that the typewritten summaries of the Crimestopper tipline calls provided in discovery do not mention of the caliber of the gun used in the November 25, 2015, homicide.  (See Reply Memo, Exs. D, E.)  Furthermore, at oral argument, Melendez pressed the point that no written record of any single call to the Crimestopper or Gunstop tiplines contained all of the information that Reynolds attributed to one caller in his Search Warrant Affidavit.  (See Trans. at 6:19-10:22, 12:12-13:15, 15:3-16:4, 30:22-32:24; see also Reply Memo Exs. D, E, F.)  The content of the call records, Melendez argues, suggest that Agent Reynolds did not receive a tip regarding Pizzaro that included the key detail of the gun type, and indicate that – in representing that a single caller supplied all of the information that formed the basis of his probable cause determination – Agent Reynolds manipulated the facts in order to mislead Judge Maas.

Defendant's arguments are unavailing.  In his affidavit in support of the warrant, Agent Reynolds indicated explicitly that "[b]oth Crimestoppers personnel and an NYPD detective spoke with the caller" demonstrating that additional information was likely elicited by the detective.  (Reynolds Warrant Aff. ¶ 10.)  In this connection, the Government has proffered Agent Reynolds' handwritten notes from those conversations (See Surreply, Exs. A, 1, 2), which clearly make reference to the caliber of the gun.[5]  The Government's proffer of these notes

---

[5] In his Reply Memo, Melendez acknowledged the existence of these notes, but argued that they "were not authenticated in any way," and urges the Court not to consider them "[u]ntil someone – ideally the law enforcement officer who produced them – attests to [their] authenticity."  (See Reply Memo at p. 11.)  In response, the Government submitted an affidavit from Agent Reynolds in which he declares the handwritten notes to be "true and correct copies of [his] handwritten notes reflecting [his] conversations with NYPD detectives on November 29, 2015."  (See Surreply, Ex. A.)  Melendez did not dispute the authenticity of the notes at the subsequent oral argument.  The Court therefore takes Agent Reynolds' sworn affidavit as evidence of the authenticity of the handwritten notes and considers them in the resolution of this motion.  See New York ex rel. Spitzer v. St. Francis Hosp., 94 F. Supp. 2d 423,

severely undercuts Melendez's argument that Reynolds made a material misrepresentation or "disregard[ed] the truth" in swearing out his warrant affidavit by citing his corroboration of the type of the gun used in the November 25, 2015, homicide. The fact that the Crimestopper tipline call summaries did not include information regarding the caliber of the gun used in the November 25, 2015, homicide therefore does not undermine the totality of evidence indicating that Agent Reynolds had a good faith belief that there was probable cause to issue the warrant, nor does it undermine the availability of the good faith exception to the exclusionary rule.[6]

Melendez's assertion that the facts contained in the Search Warrant Affidavit are actually a composite of information supplied by numerous tipsters does not alter this analysis. Both the Search Warrant Affidavit and the affidavit submitted by Agent Reynolds in conjunction with the Government's Surreply indicate that an NYPD detective spoke with an anonymous caller who supplied that detective with pertinent information on November 29, 2015. (See Search Warrant Aff. ¶ 10; Surreply, Ex. A ¶ 2.) Agent Reynolds further represents that he spoke with multiple NYPD detectives that same day, and that the information communicated by those detectives was memorialized in his handwritten notes. (See Surreply, Ex. A ¶ 3.) Nothing in the record leads the Court to conclude that Agent Reynolds should have disbelieved representations made to him by NYPD personnel that a single caller supplied all of the information memorialized in his notes that was ultimately included in the Search Warrant Affidavit.

---

426 (S.D.N.Y. 2000) ("Where a party wishes to have a court consider documents which are not yet part of the court's record, the documents must be attached to and authenticated by an appropriate affidavit and the affiant must be a competent witness through whom the documents could be received into evidence at trial.").

[6] Melendez makes a similar argument concerning the lack of any mention of Pizzaro's alleged early morning departures from the Premises in the typed Crimestopper notes, which is equally unavailing for the reasons explained above. (See Reply Memo at pp 10-11)

Moreover, nothing in the written summaries of the calls prepared by Crimestopper and Gunstop personnel forecloses the possibility that all of the information was provided by a single individual. Thus, Agent Reynolds' representation to Judge Maas that a single caller supplied all of the information recited in the Search Warrant Affidavit does not indicate that there was any effort to mislead the Court.

Melendez further argues that the good faith exception to the exclusionary rule is inapplicable because Agent Reynolds failed to provide all "potentially adverse information regarding probable cause" to Judge Maas. (Reply Memo at pp. 12-14.) In support of this argument, Melendez points out that the notes from one of the Crimestoppers calls indicate that the tipster regularly saw Pizzaro spending evenings and late nights in the vicinity of 611 Crotona Park North – nearly a mile away from the Premises address of 2116 Crotona Parkway. (See id. at pp. 13, Exs. E, H.) Melendez argues that the information relating to the 611 Crotona Park North address undercuts the reliability of the tip that Pizzaro was staying with Melendez on Crotona Parkway, and that the omission of the former information from the warrant application indicates a deliberate effort to mislead the magistrate judge as to the strength of the information concerning Crotona Parkway.

This argument, too, is unavailing. Melendez overstates his case in characterizing the Crotona Park North information as "adverse." The fact that one tipster may have seen Pizzaro at one location at certain times does not necessarily contravene another's assertion that Pizzaro was "staying" at the Premises, nor the assertion that he was storing a firearm at the Premises while staying there. To the contrary, the fact that Pizzaro was purportedly seen socializing outside a location less than a mile away from the Premises could support the assertion that Pizzaro was staying at the Premises. Furthermore, Agent Reynolds specifically

denies having seen any of the written tipster notes before making his warrant application and, even if he had been aware of the call placing Pizzaro at 611 Crotona Park North, this piece of information would not have been material to Judge Maas' determination of whether a gun and/or Pizzaro himself might be found at the Premises based on the other information contained in the Search Warrant Affidavit.[7] Thus, Reynolds' alleged omission of the tip placing Pizzaro at 611 Crotona Park North does not undermine his good faith reliance on the Warrant.

In light of Agent Reynolds' corroboration of the significant detail of the type of firearm used in the November 25, 2015, homicide – and the broader context of the totality of circumstances – the Court finds that Judge Maas did not "so obviously err[] in issuing the warrant that any reasonable officer would have recognized the error," Messerschmidt, 132 S. Ct. at 1250, and that Agent Reynolds appropriately relied on the Warrant in good faith. Nor, for the same reasons, does the Court find that the warrant application was "so lacking in indicia of probable cause as to render reliance upon it unreasonable," Moore, 968 F.2d at 222. Because Special Agent Reynolds' reliance on the Warrant issued by Judge Maas was "objectively reasonable," the Court finds that the good faith exception to the exclusionary rule is applicable. See Leon, 468 U.S. at 922 (exclusionary rule inapplicable where evidence has been "obtained in objectively reasonable reliance on a subsequently invalidated search warrant.").

---

[7] Similarly, even though Agent Reynolds was apparently aware of a caller's assertion that Pizzaro was attempting to sell the gun for funds to help him travel out of state (see Surreply, Ex. 2), this fact would not undermine probable cause to believe that, if the gun had not yet been sold, it could likely be found at the Premises.

Melendez's Request for a Franks Hearing

Melendez further argues that the Court must hold a Franks hearing to test the validity of the Warrant in light of the purported misrepresentations and omissions described above.  Pursuant to the Supreme Court's holding in Franks v. Delaware, 438 U.S. 154 (1978), a hearing must be held when the defendant has made a substantial preliminary showing that a warrant affidavit contains a false statement made knowingly and intentionally, or with reckless disregard for the truth, if the alleged misstatement is essential to the magistrate's finding of probable cause.  See id.; see also United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (defendant must make a "substantial preliminary showing that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause.").  The burden to obtain such a hearing is a heavy one, and such hearings are exceedingly rare.  See United States v. Brown, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a Franks hearing bears a substantial burden."); see also United States v. Swanson, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus Franks hearings are rarely held.").  The reviewing court must be "presented with credible and probative evidence that the omission of information . . . was designed to mislead or was made in reckless disregard of whether it would mislead." United States v. Rajaratnam, 719 F.3d 139, 154 (2d Cir. 2013) (internal quotation marks and citation omitted).  "To prove reckless disregard for the truth, the defendants [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations."  Id. (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)).

For substantially the reasons explained above, Melendez has failed to meet the heavy burden required to obtain a Franks hearing.

CONCLUSION

For the reasons stated herein, Defendant's motion to suppress the items obtained as a result of the search of the Premises is denied in its entirety, as is Defendant's request for a <u>Franks</u> hearing.

The next pretrial conference in this matter will be held on **Wednesday, August 3, 2016, at 12:45 p.m.**

This Memorandum Opinion and Order resolves Docket Entry Number 14.

SO ORDERED.

Dated: New York, New York
July 28, 2016

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge